# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-2649, 02-2650

SHEILA SMITH, *et al.*,

*Plaintiffs-Appellees,*

v.

JOHN STEINKAMP, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP01-1290-C-H/S—**David F. Hamilton**, *Judge.*

ARGUED JANUARY 6, 2003—DECIDED FEBRUARY 10, 2003

Before POSNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendants appeal from the denial of their motion to submit the claims of two of the plaintiffs to arbitration. 9 U.S.C. § 16(a)(1)(B). The defendants are Instant Cash, Inc., a small-loan company active in Indiana, and its lawyer, Steinkamp (also Steinkamp's firm, but it can be ignored). Instant Cash made "payday" loans to the four plaintiffs. A payday loan is a loan of short duration, typically two weeks, at an astronomical annual interest rate, here more than 500 percent. As the name implies, it is a loan to poor or improvident borrowers who have no savings or credit and run out of money for their living expenses before they receive their

weekly or biweekly paycheck. The borrowers *must* be desperate, since the annual percentage rate of the loans is disclosed to them in clear and conspicuous type on the loan instrument.

The plaintiffs defaulted and Steinkamp represented Instant Cash in suits against them in small-claims court. (The status of the small-claims litigation is unclear.) They riposted with this federal suit, in which they charge the defendants with RICO violations (Steinkamp they further charge with violating the federal Fair Debt Collection Practices Act) and also with violating Indiana usury law. Indiana's supreme court has held that payday loans at the interest rates typically and here charged by the lenders are usurious and therefore unenforceable. *Livingston v. Fast Cash USA, Inc.*, 753 N.E.2d 572, 574-77 (Ind. 2001). The plaintiffs have other Indiana claims as well, but we can ignore those.

The defendants moved for an order to arbitrate their federal and state law disputes with the plaintiffs, invoking an arbitration agreement that the plaintiffs had signed. It might seem that the defendants would have little to gain from arbitration, given *Livingston*. But they may think that an arbitrator is more likely to ignore or mistake the law than a judge would be; anyway there are other claims in the case besides the usury claim and the defendants may fear being dragged into class action suits if borrowers can proceed against them in state or federal court. The defendants' desire to arbitrate is therefore understandable on multiple grounds.

All the plaintiffs had signed the arbitration agreement but two of them had not signed it at the time they took out the loans on which they base this suit. Sheila Smith had borrowed $150 from Instant Cash on July 12, 2000, to be repaid on the 26th. On the same day that she signed the

loan agreement she signed a separate agreement, en-titled "Additional Terms and Conditions of This [Loan] Agreement. Waiver of Jury Trial and Arbitration Agree-ment" (we'll call this the "waiver agreement"), which provided that all disputes would be resolved by arbitra-tion with the exception of disputes within the jurisdiction of a small-claims court. "Disputes" are defined in the waiv-er agreement to

> include, without limitation (a) any federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to the [loan-applica-tion form], this Agreement [i.e., the loan agreement] (including this arbitration provision and the fees charged), or any prior agreement or agreements be-tween you and us; (b) all counterclaims, cross-claims and third-party claims; (c) all common law claims, based upon contract, tort, fraud, and other intentional torts; (d) any claims based upon a violation of any state or federal constitution, statute or regulation; (e) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us; (f) all claims asserted by you individually, as a private attorney general, as a representative and or member of a class of persons, or in any other Rep-resentative capacity, against us and/or any of our employees, agents, [etc.].

The agreement thus (in clause (f)) also authorizes agents of Instant Cash, such as Steinkamp, to demand arbitra-tion of *their* disputes with the borrowers.

On August 15, Smith signed another loan agreement, this one for $125, with repayment again due in two weeks. But this time she didn't sign a waiver agreement. Al-though the back of the loan agreement contains a list of additional terms and conditions (the same list had ap-

peared on the back of her July loan agreement) including a waiver clause, this clause, unlike what we are calling the waiver agreement, does not refer to arbitration or litigation.

The facts pertaining to plaintiff Hicks are the same. But the other two plaintiffs signed the waiver agreement every time they borrowed from Instant Cash, and the district judge held that they were bound by the agreement and so had to arbitrate their RICO and other claims. These other two plaintiffs do not appeal from this ruling, and could not if they wanted to because the grant of a motion to compel arbitration is not appealable unless the judge dismisses the case. 9 U.S.C. § 16(b); *McCaskill v. SCI Management Corp.*, 298 F.3d 677, 678 (7th Cir. 2002). But the judge held that Smith and Hicks did not have to arbitrate, because, he ruled, the waiver agreement that they had signed when taking out the earlier loans was inapplicable to the later ones. It is this ruling that the appeals challenge.

The defendants pin their contention that Smith and Hicks must arbitrate on clause (d) of the waiver agreement ("any claims based upon a violation of any state or federal constitution, statute or regulation"). But it is apparent that clauses (b) through (f), including therefore (d), relate back to (a), which limits the duty to arbitrate to disputes arising under "this Agreement," that is, the loan agreement, and to disputes arising under "prior . . . agreements." The function of clauses (b) through (f) is to make clear that neither the legal theory nor the procedural vehicle for a claim arising out of an agreement as defined in clause (a) is relevant to arbitrability; all that matters is that the claim arise from either the current loan agreement or a prior loan agreement.

Thus the waiver agreement that Smith signed on July 12 related to the loan agreement that she signed the same day plus any prior agreements between her and Instant Cash. But the dispute on which she bases her claim in this lawsuit (likewise Hicks, *mutatis mutandis*) arose out of the loan agreement that she signed on August 15. If (b) through (f) are read as standing free from any loan agreement, absurd results ensue, for example that if Instant Cash murdered Smith in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash (a "common law" suit, thus encompassed by (c)), Cash could insist that the wrongful death claim be submitted to arbitration. For that matter, if an employee of Instant Cash picked Smith's pocket when she came in to pay back the loan, and Smith sued the employee for conversion, he would be entitled to arbitration of her claim. It would make no difference that the conversion had occurred in Smith's home 20 years after her last transaction with Instant Cash.

The defendants' lawyer blanched when confronted with such hypothetical cases at oral argument but was unable to suggest a limiting principle. Or to explain why, if the agreement applies to subsequent as well as prior loan agreements, clause (a) refers explicitly to prior agreements but contains no reference to subsequent ones. We do not put too much weight on this point, however, lest it seem that if the word "prior" had not appeared in the waiver agreement the defendants would prevail. Considering who the borrowers are, an agreement requiring them to arbitrate disputes arising out of future agreements (unless perhaps they were merely rollovers, that is, renewals or extensions of previous loan agreements) might be thought unconscionable. See, e.g., *Weaver v. American Oil Co.*, 276 N.E.2d 144, 145-48 (Ind. 1971); *Ferguson v. Countrywide Credit Industries, Inc.*, 298 F.3d 778, 782-85

(9th Cir. 2002). (The applicability of the doctrine of unconscionability to arbitration clauses governed by the Federal Arbitration Act was confirmed in *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).) Or might not (we needn't decide), since the borrowers knew what they were getting into when they took out payday loans and must have thought themselves better off as a result despite the stratospheric interest rates. Those interest rates, moreover, may be as high as they are simply because of administrative costs, which are a higher percentage of the cost of making a loan the smaller the loan is—and these loans are tiny—plus the risk of default, which may be very high, the borrowers obviously being people who have difficulty living within their income. The payday-loan business is competitive, and we are given no reason to suppose that the loans of which the plaintiffs are complaining are in fact extortionate. And it is not uncommon for borrowers to contract with reference to future events, as in clauses entitling the lender to the benefit of after-acquired collateral, though remember that the defendants do not confine their submission to future loans, contending rather that the duty to arbitrate imposed by the waiver agreement applies to all future legal disputes that Instant Cash or Steinkamp may have with the signatories.

All that is certain is that the waiver agreement, read sensibly and as a whole, with careful attention to the relation among the clauses, does not apply to future disputes, including disputes over future loan agreements. But that is enough to defeat the appeals.

A cynic might argue that, given the desperation of people who take out payday loans, these plaintiffs would have signed *anything*, so that relieving them from the duty to arbitrate gives them a windfall based on an oversight by

Instant Cash. The defendants do not make this argument, however, perhaps fearing that it would invite a conclusion that payday loans are unconscionable and therefore unenforceable even in states that do not deem them usurious.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*